### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| In re: Rusty L. Packer and Kristi Jo Packer, | ) | Bankruptcy No. 17-81746 |
| | ) | |
| Debtors. | ) | Chapter 12 |
| | ) | |
| | ) | Judge Lynch |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the motion of First Trust and Savings Bank of Albany, Illinois (the "Bank") to convert the bankruptcy case to Chapter 7. For the reasons discussed below the Bank's motion will be denied.

### FINDINGS OF FACT AND PROCEDURAL HISTORY[1]

Rusty Packer and his wife Kristi Jo Packer commenced this Chapter 12 bankruptcy on July 27, 2017. They operate a family farm. For a majority of the time they have been farming they have operated through a limited liability company owned by the Debtors jointly, named Packer Farms, LLC. Rusty Packer testified that they formed Packer Farms, LLC approximately eight to ten years ago to conduct the farming they had previously "been doing in [their] own name." (Tr. 75:9-15.)[2] He testified that they formed the entity out of concern over insurance and potential

---

[1] The following sets forth this court's findings of fact in accordance with Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[2] Rusty Packer testified in a hearing on cash collateral held April 6, 2018, that he "started farming in 2008." (ECF No. 144, 93:16-17.)

liability once they started hiring outside workers for the farm. (Tr. 75:14-21.) Also involved in the Debtors' farming operations are Midwest Agri-Services, LLC, wholly owned by the Debtors, and Genesys Specialty Group, LLC, owned 50% by Rusty Packer and 50% by an individual named Chad VanHolten. (Stipulations, ECF No. 122.) None of Packer Farms, LLC, Genesys Specialty Group, LLC or Midwest Agri Services, LLC has filed for bankruptcy protection, and Genesys has no contractual indebtedness with the Bank. (*Id.*).

The Bank seeks conversion of the case to Chapter 7 pursuant to Section 1208(d).[3] That section provides for conversion "upon a showing that the debtor has committed fraud in connection with the case." 11 U.S.C. § 1208(d).  In the Motion to Convert Case to Chapter 7 (ECF No. 34, the "Motion"), the Bank alleges that the Debtors made material misstatements of fact in their bankruptcy schedules and in a motion to authorize use of cash collateral they filed with the court.  The Bank also alleges the Debtors "are holding [their] crops hostage as a lever to negotiate for the use of cash collateral far beyond what the Code allows." (*Id.*)[4]  In its reply, the Bank alleges that, by taking inconsistent positions on whether certain property is owned

---

[3] The Bank does not request dismissal of the case.  In its reply brief the Bank explains that it seeks conversion, not dismissal, in the hope that a Chapter 7 trustee will, in the Bank's words, "look into what happened [during the 18 months prior to the petition date and] if assets are found ... bring the necessary actions to bring them into the estate for the benefit of creditors." (Reply, ECF No. 61, pg. 9.)
[4] Although the initial Motion also alleged that the Debtors have "no reasonable likelihood of a rehabilitation" based on the amount of debt and the Debtors' income, the parties have stipulated that the "hearing on First Trust's Motion to Convert shall not concern the confirmability or feasibility of any Chapter 12 Plan proposed by the Debtors, and accordingly shall not concern the value of any of the Debtors' properties or the interest rate or discount rate that might be applicable to a restructuring of the debt of the Debtors. Such issues concerning the Plan are reserved, with the Debtors, First Trust, and the Chapter 12 Trustee reserving all rights associated with such issues. The Chapter 12 Trustee joins this Stipulations of Fact solely for the purpose of affirming this particular stipulation." (Stipulation, ECF No. 122, ¶3.)

by the Debtors or their non-debtor affiliates, the Debtors have "misused the bankruptcy process and have played fast and loose with their cash assets and the cash of their affiliates." (Reply, ECF No. 61, pg. 2.)

The court held a trial on March 6, 2018, at which the only witnesses were Debtor Rusty Packer and president and CEO of the Bank, Mark Hanson. The Chapter 12 trustee has not joined in the Motion and, while counsel for the trustee attended the trial, she neither called nor questioned any witnesses. The trustee had filed her own separate motion to either dismiss or convert the case on October 26, 2017 (ECF No. 44), but withdrew that motion on the date of the trial, March 6, 2018 (ECF No. 126.) The trustee has a pending objection to confirmation of the Debtors' current proposed plan of reorganization, filed March 6, 2018, and that objection includes a request for either dismissal or conversion of the case to Chapter 7. However, the trustee's objection asserts completely different grounds for the request than the Bank's, primarily arguing that the proposed plan is not feasible and fails to comply with certain requirements for confirmation, and that the Debtors have not yet provided certain documentation requested by the trustee.[5]

The Debtors' bankruptcy schedules disclose Rusty Packer "doing business as" Packer Farms, LLC, Midwest Agri Service, Avant Partners, LLC and Genesys Specialty Group. The Debtors listed among their assets a 50% interest in "Genesys

---

[5] While the trustee's objection also alleges that the Debtors' schedules are incomplete by failing to list 3 pieces of equipment, an interest in a class action suit, a secured creditor, a counterparty to a lease, and Kristi Packer's income from the farming operations, no evidence on such issues was presented at the trial on the Bank's motion. As noted above, the trustee's objection was filed on the date of the trial and not filed in connection with the Bank's motion.

Special Group" [sic], a 100% interest in Packer Farms, LLC and a 100% interest in "Agri Services," reporting each as having an "unknown" value. (ECF No. 1.) They listed as real property their residence in Erie, Illinois, a 76.5 acre parcel of land in Erie, a 31.42 acre parcel of land also located in Erie and a 12.5 acre parcel of land in Albany, Illinois. The Debtors designated each as owned by Rusty & Kristi Packer only.[6]

The Packers also listed a 2015 GMC 2500 truck as owned by Kristi Packer only, but stated as "Other information: *Packer Farms." (ECF No. 1, pg. 15.) As deposits of money, they listed a checking account at First Trust & Savings of $35.34, a checking account at Central Bank of Illinois of $8,269.00, a savings account at First Trust & Savings of $403.00 and a savings account at Central Bank of Illinois of $175.00. They also listed: "checking, *Packer Farms – Checking – Central Bank of Illinois, $500," "checking, **Midwest Agri Service w/ Central Bank: $168.00," and "Savings, **Midwest Agri Service, $57.00." (ECF No. 1, pg. 17.) The Debtors scheduled as "other contingent and unliquidated claims" what they described as "*Packer Farms – 2014 crop insurance (claim from Wisconsin)" of "unknown value" and described as other financial assets what they described as "Uncashed checks (3) – First Trust & Savings named as co-payee - $6,407.09; $11,415.99; $23,113.68," totaling $40,936.76. (*Id.* at pg. 19.)

The Packers listed several pieces of farm-related equipment with the

---

[6] They also listed among their real estate holdings a Disney timeshare, not at issue in the motion.

designation "*Packer Farms" or "**Midwest Agri."[7]. They listed as other property "Packer Farms – office supplies, desk/chair located at 13559 Black Rd." worth "$2,000," and stated "see attached list" for "**Midwest Agri Services – misc. equipment" and "Packer Farms – misc. equipment." (Id. at pg. 23.) However, they did not attach the referenced list to their schedules.

Finally, the Packers listed "Growing crops – see attached worksheet," stating a value of $176,925.75. The referenced worksheet is found attached to their Schedule I (income) rather than Schedule A/B (property).[8] The worksheet, entitled "Packer Farms L.L.C. 2017 Crop Plan" provides the following information:

| Farm | State | Soil Type | Acres | 2017 Crop | Estimated Yield | Price | Bushells | | Rented to: |
|------|-------|-----------|-------|-----------|-----------------|-------|----------|--|-----------|
| Erie | Illinois | Gumbo | 34.70 | Soybeans | 45 | $10.00 | 1,561.50 | $15,615.00 | Genesys |
| Peat | Illinois | Peat | 29.60 | Corn | 0 | | | | Parents |
| Erie | Illinois | Sand | 98.80 | Soybeans | 35 | $24.00 | 3,458.00 | $82,992.00 | Genesys |
| Home | Illinois | Sand | 7.00 | Rye | 40 | $9.00 | 280.00 | $2,520.00 | Rusty |
| Fenton | Illinois | Clay | 8.60 | Soybeans | 0 | | | | VonHolten |
| Home | Illinois | Sand | 61.50 | Corn | 145 | $8.50 | 8,917.50 | $75,798.75 | Rusty |

Estimated Revenue: $176,925.75

(ECF No. 1, pg. 52.)

With regard to this worksheet, Mr. Packer testified that he and his wife owned the farmland designated as "Home." (Tr. 27:11-15.) The farmland designated "Erie" was owned by the Village of Erie and leased to Genesys Specialty. (Tr. 28:6-14.) He

---

[7] The listed farm equipment designated as "*Packer Farms" includes: a 2009 Westfield MK100-71 Auger, a Unverferth 5 shank – 110 Zone Builder, a Kinze 2300 12 row planter (designated as "50% owner"), a Yetter 30; rotary hoe, a Case IH 1830 6' cultivator and 12' cultivator, a Lilliston 6' cultivator, a Kinze 6' cultivator, a John Deere 726 33 ft. soil finisher, a 2009 Woods BW batwing mower, a Land Pride 72" finishing mower, a Bush Hog – 3PT blade, a John Deere Hawy Rack, a John Deere cultipacker, a John Deere running gear and a fuel trailer. The farm equipment designated as "**Midwest Agri Services" included: a 1994 Volvo semi tractor, a 2010 Big TX trailer and a Chandler Litter spreader 18'.
[8] Attached to Schedule A/B was a 2017 cash flow statement for Rusty Packer, which apparently belonged with Schedule I.

further testified that the crops growing on the "Home" farm in 2017 were owned by "[Mr. Packer] and [his] wife or Packer Farms" (Tr. 28:3-4) and the crops growing on the Erie Farms "were owned by Genesys Specialty." (Tr. 28: 12-14.) While Mr. Packer did not specifically testify as to who owned the "Peat" farm or the "Fenton" farm, he recounted that the Peat farm was rented to his parents and the Fenton farm was leased to an individual named Chad VonHolten. (Tr. 49:14-17, 51:22-25.)[9]

The Bank has stipulated that "for purposes of the Motion to Convert it does not challenge" the Debtors' assertion that "they own fifty percent of Genesys and that Chad VanHolten owns the remaining 50 percent." (Stipulation, ECF No. 122, ¶ 10.) Mr. Packer testified that although he planted the crops, neither he nor his wife had an interest in the crops planted on the Peat or Fenton farms. (Tr. 50:10-15; 52:10-12.) Instead, he testified that he planted the crops on those and the Erie farms pursuant to "custom farming agreements with Genesys, Chad VonHolten, and [Mr. Packer's] parents." (Tr. 56:11-16.) Mr. Hanson from the Bank testified without objection that a "custom farm agreement involves the farmer farming land he does not own" and under such agreement, "the owner of the crops would not be the farmer." (Tr. 103:18-104:2.) While both parties prepared a joint proposed exhibit binder which included what purports to be written custom farm agreements, they were not offered into evidence.

---

[9] The "Fenton" farm seems to correspond to "a 12 acre parcel used for farming ... located in Fenton Township, Whiteside County, Illinois" which the parties stipulated that the Debtors jointly own. (Stipulation, ECF No. 122, ¶5.) The "Peat" farm seems to correspond to "a 30+/- acre parcel used for farming ... located on Black Road in Morrison, Whiteside County, IL" which the parties stipulated that the Debtors jointly own and leased to "Rusty Packer's father, under a Cash-rent Farm Lease dated March 1, 2017." (*Id.* at ¶¶5, 8.)

In questioning Mr. Packer at trial, the Bank highlighted that the Debtors had listed the following creditors in their bankruptcy schedules: Ag Direct, AmTrust (*Farm debt), ATD Distribution (**Midwest Agri Service), Brandner Mapping & Sales (*Farm debt), Digi Farms (*Farm debt), Freys Iron Work (*Farm debt), K&W Popcorn, Inc. (*Farm debt), Lectronics (*Farm debt), Nau County Insurance (*Farm debt), OT and T, Inc. (**Midwest Agri Services), Roy Lindstrom and U.S. Bank Visa (**Midwest Agri Services). The Bank also designated Mr. Packer's deposition testimony that the Debtors' bankruptcy schedules listed: GM Financial (*Packer Farms – Truck), Axis Seed (*Farm Debt), Beierman Agri-Systems (*Farm debt), Feltis Custom Harvesting (*Farm Debt), and First Farm Credit (**Midwest Agri Service – Tractor). At trial Mr. Packer testified that either Midwest Agri Service or Packer Farms, LLC was obligated on each of these debts and for most was the primary obligor. But he also testified that he believed he or his wife were also liable on each of the debts as a co-signer or co-obligor.

Although he was unable to produce written evidence showing his personal liability for some of these debts, the court finds credible at least his testimony that he believed he was personally liable at the time the schedules were filed. While for none of these debts did the Debtors mark the available box on the schedule to indicate that the debt was incurred by "at least one of the debtors and another," for all – except the Ag Direct claim and the Roy Lindstrom debt – they listed on the schedule "*Farm debt" or "*Midwest Agri Service" showing that the debt was of or related to Packer Farms, LLC or Midwest Agri Service. With respect to the Lindstrom debt, Mr. Packer

testified that while Mr. Lindstrom was "the lawyer for Midwest Agri-Services" he was also the Debtors' "lawyer for everything that we do." (Tr. 132:17-21.)  Neither party presented evidence to show the nature of work to which the listed debt related.  With respect to Ag Direct, Mr. Packer could not recall precisely what the claim was for, but testified that he was "confident I've got personal liability." (Tr. 123:23-124:1.)

In their Schedule G the Debtors listed as executory contracts and unexpired leases several equipment and vehicle leases with First Farm Credit, Gifford State Bank and U.S. Bank, describing each lease with a designation of either "**Midwest Agri Service" or "*Packer Farms" and describing the applicable vehicle or equipment. They listed both "Midwest Agri" and "Packer Farms" as co-debtors in Schedule H, but did not designate which claims they were co-debtors on, despite the form providing space to do so.

The Debtors filed a motion to use cash collateral on August 3, 2017, seeking authorization to use unspecified "Cash Collateral" (a term used but not defined in the motion) to "fund expenditures for planting and harvesting the 2017 crop season" and other expenses. (ECF No. 14, hereinafter, the "Cash Collateral Motion".)  In exchange, the Debtors offered the Bank and certain other secured lenders periodic payments and "a post-petition replacement lien on the accounts receivables, growing crops, and equipment, and cash of Debtor." (*Id.*)  The Debtors described their assets in the motion, including:

> The farms products as listed on the Debtors' schedules are valued at $176,925.75 ("Farm Products"). The Debtors also have on hand $40,936.76 in uncashed checks ("Uncashed Checks") from the sale of the 2016 Crop Harvest which have listed First Trust as a co-payee…. The

> Debtors expect to realize approximately $176,925.75 when the Farm
> Products are sold and government subsidies regarding the same are
> received.... The Debtors also have harvested crops in storage valued at
> $83,000.00 ("Old Inventory").

(*Id.*) The Cash Collateral Motion also described the Debtors' relationship to Packer

Farms, LLC, Midwest Agri Service, LLC and Genesys Specialty Group, LLC, stating:

> Packer Farms and Midwest Agri are both wholly owned by the Debtors.
> Packer Farms is the primary farming enterprise under which all
> operational farming is run. Midwest Agri formerly was engaged in the
> manufacture and distribution of soil amendments, chemicals, seed, and
> fertilizer but has ceased doing business. The Debtor Rusty Packer owns
> a fifty-percent (50%) interest in Genesys. Genesys is in the business of
> marketing and selling fertilizer products.

(*Id.*)

Although the Bank initially objected to the Cash Collateral Motion, it

eventually agreed to an interim order entered September 15, 2017, permitting the

Debtors to use up to $9,000 for family living expenses and up to $6,000 on farm

expenses. (ECF No. 29.)  That order granted secured creditors including the Bank

replacement liens and required the Debtors to open a new separate bank account to

be referred to as the "Cash Collateral Account" into which all checks and crop sale

proceeds were to be "promptly deposited." (*Id.*) The referenced cash collateral account

was opened at the Bank. (Tr. 34:16-18.)  The checks mentioned in the Debtors'

schedules and the Cash Collateral Motion were deposited into the Debtors' cash

collateral account at First Trust with the Bank's consent and at the Bank's direction.

(Tr. 54:14-55:5.) Those checks had been made payable to Packer Farms, LLC and to

First Trust and Savings Bank. (Tr. 31:18 – 21:8.)  However, Mr. Packer testified

without contravention that the checks were made out as such at his, Rusty Packer's,

request. (Tr. 92:19-24.)

Mr. Hanson testified at trial that he did not realize until October 2017 that the Erie farm property had been leased to Genesys or that the Debtors did not have a direct interest in the portion of the $176,925.75 in expected 2017 crop proceeds attributable to the Erie farms. (Tr. 101:1-102:10.) He further suggested that the Bank might not have agreed in September 2017 to permit the Debtors to use $15,000 in cash collateral had he been aware of that fact. (*Id.*)

However, the "Packer Farms L.L.C. 2017 Crop Plan" attached to the Debtors' bankruptcy schedules and filed with their petition on July 27, 2017, clearly stated that the two Erie farm properties were "Rented to Genesys." (ECF No. 1.) Mr. Hanson testified that he had seen the schedules, including the "Crop Plan" worksheet at or shortly after the time of the bankruptcy filing and had "made [a] connection between [the] worksheet and the number that appears" in the Cash Collateral Motion, noting that the total expected crop proceeds in the two documents matches." (Tr. 99:14-100:2.) Moreover, the Cash Collateral Motion expressly stated that the "Debtor farms approximately 67.5 acres of land owned by the Debtor, and custom farms another 171.7 acres through custom farming agreements with Genysis, Chad Van Holten, and his parents." (*Id.*) Mr. Hanson testified that he was generally familiar with farming and custom farming agreements and that he understood that generally under such agreements "the owner of the crops would not be the farmer." (Tr. 103:9-104:2.)

The Cash Collateral Motion does not state that the Debtors had a direct interest and right to receive the estimated $176,925.75 in crop proceeds. Instead, it

refers to the Debtors' bankruptcy schedules, stating that the farm products listed in the schedules "are valued at $176,925.75." As mentioned above, those bankruptcy schedules indicate in the "rented to" column that two of the properties generating expected crop revenues were rented to Genesys. Further, the descriptions of the farming operations in the Cash Collateral Motion and bankruptcy schedules clearly indicate that a portion of the income the Debtors receives is through the three limited liability companies and that the Debtors' interests in certain assets are only indirect and through their ownership interests in such companies.

The Bank argues that because the Debtors only had a 50% interest in Genesys they should have only included half of the expected proceeds from the crops generated through Genesys in their description in the cash collateral motion. But the Bank's evidence failed to support this conclusion. The Bank did not, for example, offer a copy of Genesys' operating agreement or statement of the company's capital accounts or balance sheet. Nor did it show the Debtors' rights to payment from Genesys were solely pursuant to their membership interest. To the contrary, Mr. Packer testified that he farmed the Genesys crops under a custom farming arrangement and that he believed he had a legal or equitable interest in the crops on that basis. (Tr. 48:3-13.)

Based on this record, the court finds that the Bank has not demonstrated that the Debtors made a misrepresentation as to their rights in the expected proceeds in the Cash Collateral Motion.[10]

---

[10] Nor has the Bank shown any such purported misrepresentation to have been fraudulent. The Bank argues that the Debtors misrepresented crops of Genesys as their own in order to induce the Bank to permit use of cash collateral. But if the proceeds were the property of Genesys and not the Debtors,

## JURISDICTION

The Motion seeks to convert the bankruptcy case from Chapter 12 to Chapter 7 pursuant to Section 1208(d) of the Bankruptcy Code.  It therefore is a proceeding arising under title 11 and would have no existence if not created by the Bankruptcy Code.  Accordingly, this court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  It is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) in which this court has constitutional authority to enter final orders.

## DISCUSSION

### Conversion of a Chapter 12 Case to Chapter 7

The Bank seeks only conversion and, therefore, this opinion addresses only whether the Debtors have committed fraud in connection with the case, the sole ground for conversion of a Chapter 12 case.[11]  On request of a party in interest, "the court may dismiss a case under this chapter or convert a case under this chapter to a case under chapter 7 of this title upon a showing that the debtor has committed fraud in connection with the case." 11 U.S.C. § 1208(d).  The Seventh Circuit has held in the context of a Chapter 11 bankruptcy that Congress' use of the permissive term

---

the Debtors would not have needed bankruptcy court approval for Genesys's use of funds in the first place. Additionally, the Debtors' agreement to cause the entities to deposit crop proceeds checks into the cash collateral account at the Bank is inconsistent with the scheme asserted by the Bank.

[11] The court therefore does not address at this time the Chapter 12 trustee's pending objection to confirmation, which includes a request for dismissal. (ECF No. 123.)  Nor does the court here make any finding as to the confirmability of any plan or whether "cause" exists for dismissal as such term is defined in Section 1208(c).

"may" in the phrase "the court *may* convert" in Section 1112(b) indicates that the decision to do so "is in the bankruptcy court's discretion." *Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.)*, 886 F.2d 859, 868 (7th Cir. 1989). *See also Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 377 (2007) (Scalia, J., dissenting) (noting "the terms of § 706 and the language employed in other Code provisions that give bankruptcy judges the discretion to deny conversion requests [by using the words] 'may convert'"). The counterpart for Chapter 12 bankruptcies, Section 1208(d), uses the identical phrase "may convert." No indication to the contrary being found in the statute, it follows then that the decision to convert a Chapter 12 case also lies within the court's discretion even where fraud is shown.

### *Burden of Proof*

Courts disagree on the proper standard of proof of such fraud for a motion to convert. The Supreme Court, in discussing the standard for excepting from discharge fraud-related debts under Section 523(a)(2), has held that on issues of federal law governed by the terms of the Bankruptcy Code and in the absence of express language in the statute or legislative history to the contrary, courts should presume that the preponderance-of-the-evidence standard "is applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake." *Grogan v. Garner*, 498 U.S. 279, 284-86 (1991) (internal quotation marks omitted). Noting that there is no "constitutional or 'fundamental' right to a discharge in bankruptcy," the Court held that the preponderance of the evidence is the applicable standard for Section 523(a)(2). *Id.* Further noting that "Congress has

chosen the preponderance standard when it has created substantive causes of action

for fraud" such as in the False Claims Act, the Court was unpersuaded that Congress

intended a higher standard for Section 523(a)(2) merely because the majority of states

required proof of fraud under state common law by clear and convincing evidence.

498 at 288. The Seventh Circuit has similarly found that the lower preponderance of

the evidence standard applies to denial of a discharge under Section 727(a), including

denial for a knowing and fraudulent false oath or account in connection with the

bankruptcy case under Section 727(a)(4). *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir.

2011).

Some courts have concluded from this that the preponderance of the evidence

standard applies to conversion under Section 1208(d). *See, e.g., In re Massie*, 231 B.R.

249, 251 (Bankr. E.D. Va. 1999); *Clark v. Devries (In re Clark)*, 2014 WL 835824 (D.

Idaho Mar. 4, 2014), *aff'd by* 652 Fed. Appx. 543 (9th Cir. June 15, 2016). Other courts

have found the extraordinary nature of conversion of a family farmer's case to place

at stake particularly important individual interests or rights, warranting the higher

clear and convincing standard. *See, e.g., In re Nichols*, 447 B.R. 97, 107 (Bankr.

N.D.N.Y. 2010). [12]  *See also In re Valentine Hill Farm LLC*, 580 B.R. 815, 817 n.2

---

[12] See also *In re Caldwell*, in which the court concluded that "based upon: (1) the broad language of section 1208(d) which does not delineate the specific circumstances of fraud found in section 727 or section 523; (2) the unnecessary confusion which may result in applying different standard of proof to the same section of the Code; (3) the substantial modification of historical protection for farmers; (4) the expedited nature of a contested hearing; and, (5) because fraud traditionally has required a high burden of proof, a standard of clear and convincing evidence must be applied in order to convert or dismiss a case under section 1208(d)." 101 B.R. 728, 735 (Bankr. D. Utah 1989). *Caldwell*, however, pre-dates the Supreme Court's decision in *Grogan*, and the court was at least partially influenced by case law within the district holding that the standard of proof for Section 523(a)(2) was clear and convincing evidence. 101 B.R. at 733 (citing *Joseph Stone (In re Stone)*, 91 B.R. 589, 591 (D. Utah

(Bankr. S.D. Ind. Jan. 25, 2018) (noting split in authority, but not needing to address the issue since court granted debtor's competing motion to voluntarily dismiss).

As discussed in *In re Nichols*, Congress has long recognized the unique status of farming – and not just "family farmers" – giving farmers special protection in the bankruptcy laws. 447 B.R. at 107 (citing Katherine M. Porter, *Phantom Farmers: Chapter 12 of the Bankruptcy Code,* 79 Am. Bankr. L.J. 729, 730 (2005)).[13] A notable feature is the protection Congress granted farmers from having involuntary bankruptcy petitions filed against them, 11 U.S.C. § 303(a), and from the conversion of a Chapter 11 or Chapter 13 case filed by a farmer from being converted to Chapter 7 or Chapter 11 without the debtor's consent. 11 U.S.C. §§ 1112(c), 1307(f). Indeed, the only way a family farmer may be forced into a Chapter 7 liquidation[14] without his or her consent is through Section 1208(d). *In re Valentine Hill Farm LLC,* 580 B.R. at 817. Through Chapter 12, enacted in 1986 and made permanent in 2005, Congress protected family farmers by giving creditors less control and "few[er] tools ... to derail a debtor's efforts to reorganize" in Chapter 12 than in Chapter 11. 447 B.R. at 107 (quoting 79 Am Bankr. L.J. at 733). Congress included Section 1208(d) within this scheme to prevent abuse of the bankruptcy system where the debtor has committed

---

1988)). However, the *Caldwell* court also cited "controlling case law [within the] jurisdiction" that the standard for Section 727(a)(4) was preponderance of the evidence – noting that Section 727(a)(4)'s language was closer to the language in Section 1208(d). *Id.* (citing *Farmers Coop. Ass'n v. Strunk,* 671 F.2d 391, 395 (10th Cir. 1982)).

[13] For example, the restrictions on bringing involuntary cases against farmers long predate the enactment of Chapter 12 or, for that matter, the 1978 Bankruptcy Reform Act. Indeed, as Professor Porter notes, "[b]eginning in 1898, farmers were protected from creditors' attempts to force them into an involuntary bankruptcy case." 79 Am. Bankr. L.J. at 730.

[14] While a Chapter 12 plan may, in part, provide for the liquidation of property, 11 U.S.C. §1222(b)(8), only the debtor may file a plan in Chapter 12. 11 U.S.C. § 1221.

fraud in connection with the case. 447 B.R. at 107 (citing *In re Pianowski*, 92 B.R. 225, 232 (Bankr. W.D. Mich. 1988)).

This court, however, need not here determine whether Congress' special treatment of family farmers warrants the higher standard of proof in making the determination, because the Bank has failed to meet its burden of demonstrating fraud in connection with the case even under the broader preponderance of the evidence standard.

## The Bank Failed to Demonstrate Fraud in Connection with the Case.

There is relatively little case law on what constitutes "fraud in connection with the case" for purposes of Section 1208(d). To be sure "more than 'bad faith'" is required, and at "a minimum, it involves a debtor's intentional provision of misleading information or intentional failure to disclose material information on his schedules." *In re Valentine Hill Farm LLC*, 580 B.R. 815, 817 n.2 (Bankr. S.D. Ind. Jan. 25, 2018). Types of fraud "that might be considered cause for an involuntary conversion would include intentional concealment of assets and intentional misrepresentations to the court [but] there is no need for a showing that creditors relied to their detriment on the debtor's fraudulent statements or acts." *In re Sartorius*, No. 92-82922, 1996 WL 33401631 (Bankr. C.D. Ill. Oct. 31, 1996) (quoting 5 Collier on Bankruptcy, ¶ 1208.01[4]).

The Seventh Circuit has noted with approval a broad definition of the term "actual fraud" in the context of Section 523(a)(2): "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat

another." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (quoting 4 Collier on Bankruptcy ¶ 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King ed., 2000)). While this definition does not necessitate a misrepresentation, it does require a showing of intent to hinder or defraud. 217 F.3d at 894. Fraudulent intent may be proven through circumstantial evidence. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002). Similarly, in the context of denial of discharge under Section 727(a)(4) where the debtor "knowingly and fraudulently, in or in connection with the case... made a false oath or account" the Seventh Circuit has held the plaintiff must demonstrate: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *In re Kempff*, 847 F.3d 444, 449 (7th Cir. 2017) (internal citations omitted). Fraudulent intent for purposes of Section 727(a)(4) "includes intending to deceive, which need not connote intending to obtain a pecuniary benefit" and evidence of "reckless disregard for the truth is sufficient to prove fraudulent intent." *Id.* (internal citations omitted).

The Bank argues that the Debtors' schedules and filings contain many false or misleading statements, demonstrating a pattern showing reckless indifference to the truth or actual fraud. *See, e.g., In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014) (debtor's "many false statements besp[oke] a pattern of reckless indifference to the truth, implying fraudulent intent"). Bankruptcy debtors "have an absolute duty to report whatever interests they hold in property, even if they believe their assets are

worthless or are unavailable to the bankruptcy estate." *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992). But here the statements in the Debtors' schedules the Bank identifies as false or misleading are all examples of overinclusion of assets and debts, not omission or concealment, describing assets and liabilities in which it is not disputed the Debtors have at least an indirect or partial interest. The Debtors listed in their schedules certain assets and liabilities owned or owed by corporate entities in which they had either a 100% or 50% interest. In contrast, in the cases cited by the Bank where courts have found fraud warranting conversion of a Chapter 12 case based on false statements in schedules, the false statements all related to omissions of assets, liabilities, income or transfers. *See In re Williamson*, 414 B.R. 886 (Bankr. S.D. Ga. 2008); *Agribank, FCB v. Kingsley (In re Kingsley)*, 162 B.R. 249 (Bankr. W.D. Mo. 1994); *In re Caldwell*, 101 B.R. 728 (Bankr. D. Utah 1989); *In re Graven*, 101 B.R. 109 (Bankr. W.D. Mo. 1989). Indeed, counsel for the Bank admitted that the cited Section 1208(d) cases all "deal[t] with omissions of assets." (Apr. 6, 2018 Tr. 20:16-17, ECF No. 144.)

A fifth case cited by the Bank, *In re Nichols*, denied the creditor's motion to convert, finding that errors in schedules much closer to those at issue here do not constitute "fraud in connection with the case." 447 B.R. 97, 109-112, 114 (Bankr. N.D.N.Y. 2010). In *Nichols* the debtor had mistakenly believed that he had transferred interests in certain of his farm property pre-petition to a corporation he owned with his son, and had listed that property in his bankruptcy schedules as owned by the corporation. The court found that the debtor had not committed fraud

in connection with the case, noting in part that the debtor "listed all assets believed to be under his or Galilee's ownership in his petition once he filed for bankruptcy relief." 447 B.R. at 114. He had relied on advice of counsel and accountants and had believed in good faith that both the transfer of assets to the corporation and the transfer of a percentage interest in the corporation to his son prepetition were effective. The court also found credible the debtor's testimony that the formation and attempted transfers were part of a legitimate plan for family succession of the family farm to his son, who had worked on the farm. Although one or more of the transfers might not have been effective, the court found the debtor's disclosure of the assets served to negate an inference of fraud.

Here, too, the Debtors listed "all assets believed to be under [their] or [their companies'] ownership in [their] petition," but unlike the disputed listings in *Nichols* the corporate designations here are correct. Indeed those corporate designations in the Packers' schedules weigh strongly against the contention that the Debtors misrepresented property of the entities as directly their own. For assets owned by the corporate entities, the Debtors denotated "*Packer Farms" or "**Midwest Agri Service," entries that appear intended to bring these entities to the attention of the reader. While there may have been a better or clearer way to present the information in the schedules, the court finds credible Rusty Packer's testimony that the denotations were intended "to have full disclosure and be transparent and explain to where I think the collateral was, was at." (Tr. 146:16-18.)

In the detail sheet listing expected 2017 crop proceeds, the Debtors denoted

that at least two of the parcels were rented to Genesys.  The Bank argues that the

Debtors should have listed the value as half the full expected proceeds to reflect his

half interest in Genesys.  But the Bank did not demonstrate that the Debtors' direct

or indirect rights with respect to such proceeds were so limited, let alone that the

Debtors fully understood the nature of their interests.  Moreover, even if the Debtors'

rights to the proceeds were limited to 50%, the Debtors provided at least enough

information for the trustee and creditors to seek further information or clarification.

While it may have been preferable had the Debtors provided a fuller explanation in

their schedules, simply listing half the amount as suggested by the Bank may well

mislead some to believe the Debtors are entitled to only half of that half, a potential

understatement of the Debtors' interest.

Similarly for liabilities, the Debtors should have marked the box indicating

that the debt is owed by "at least one of the debtors and another" for debts on which

the Debtors were jointly liable with one of the corporate entities.  However, with the

possible exception of the references to Roy Lindstrom and Ag Direct, the entities

denoted by the Debtors as joint debtors, "*Packer Farms," "**Midwest Agri Services"

and "*Farm debt", are all entities in which the Debtors undisputedly hold an interest.

With respect to Lindstrom, the Bank failed to demonstrate that the debt indicated

was not owed by the Debtors.  The Debtor's listing of Ag Direct in their Schedule F

filed with the petition, on the other hand, stated the amount of the Debtors' liability

to be "unknown." (Schedule F, 7/24/2017, Line 4.1 (Stipulated Ex. 1 at 32).) At trial,

Mr. Packer testified that he believes he is personally liable to Ag Direct for a piece of

equipment, but he does not know "what exactly piece of equipment [sic] is was. (Tr. at 123:7-17.)  He further testified "[i]f it's with Ag Direct, I'm confident I've got personal liability." (Tr. at 123:25 – 124:1.) Here the Bank does not base its argument on contemporaneous evidence about that supposed debt or the Debtor's understanding.  The Bank does not convince this court that the Debtors' notation about his unknown liability to that creditor contained in a schedule filed at the commencement of this case is fraudulent based upon an invoice months after the Debtors prepared and filed their Schedule F.[15]

The Bank argues that the Debtors included corporate assets in their schedules and suggested their direct ownership of such assets in their cash collateral motion in order to overinflate their sources of income and assets from which they could offer

---

[15] Stipulated Ex. 41, Ag Direct invoice to Midwest AgriServices LLC at Morrison, Illinois, dated December 16, 2017. Despite the opportunity to examine the Debtor on this point, the Bank did not establish that the Debtor had received any relevant invoice or statement from this creditor when he filed his petition and schedules earlier that year on July 27. See cross-examination of Randy Packer (Tr. 123:18 – 124:14):

    Q.   I'd like you to turn to Exhibit 41.
    A.   OK.
    Q.   This is a invoice of Ag Direct.  It appears to be to Midwest Agri-Services, LLC [sic].  Do you see that?
    A.   Yes.
    Q.   Mr. Packer, do you have or have you looked for any document that shows you have personal liability for this debt?
    A.   If it's with Ag Direct, I'm confident I've got personal liability.
    Q.   Do you have any documents [sic] that show –
    A.   I'd have to review the files.
    Q.   Well, did you review those files when you received the request for production of documents which I showed to you earlier?
    A.   I provided my – my –what I felt was the latest documents that I had on file.
    Q.   And to the extent there is a document it would have been produced.  Is that your testimony?
    A.   The answer is yes, I went ahead and reviewed the documents, the latest one I thought I had on file.  I thought that's what the question was being asked to me, is my latest one that I have.
    Q.   I want to go to the next [exhibit]....

adequate protection for use of cash collateral. The Bank's argument, however, rests on speculation. The Bank fails to show that that in fact was the Debtors' intent. As discussed above, the Packers' schedules clearly state which assets are owned by non-debtor entities and disclose the Debtors' interests in such entities. Their schedules prominently disclose the Debtors' interests in Packer Farms, Midwest Agri Services and Genesys and identify assets and liabilities owned or owed by or otherwise related to those entities.

To be sure, there is evidence that the Debtors' schedules contain mistakes such as their failure to mark the correct box to indicate others are liable on a scheduled claim. But proving fraud requires more than identifying mere mistakes. *See, e.g., In re Kempff*, 847 F.3d 444, 451 (7th Cir. 2017) (upholding the bankruptcy court's factual finding in a Section 727(a)(4) case that the credible testimony of the debtor showed that a series of errors in the debtor's bankruptcy schedules were simple "misstatements [attributable] to simple negligence or innocent misunderstandings – by [the debtor] herself or by her attorney"); *Sullivan v. Ratz*, 551 B.R. 338, 351 (N.D. Ill. 2016) ("the determination of intent often turns on an assessment of the debtor's credibility."). "Debtors are not expected to know all of the intricacies of the Bankruptcy Code and therefore mistakes – even multiple mistakes – made during the course of bankruptcy are not necessarily made with fraudulent intent." *Takada v. Isaacson (In re Isaacson)*, 564 B.R. 380, 385 (Bankr. N.D. Ill. 2017).

Additionally, while a large number of errors may indicate a "pattern of reckless indifference to the truth," here all or virtually all of the purported misstatements

identified by the Bank relate to the same issue – whether the Debtors should have scheduled corporate assets and liabilities and risk being overinclusive, and whether the Debtors sufficiently identified such assets and liabilities as corporate.  In this respect, the case resembles *Spohn v. Carney (In re Carney)*, where the testimony of witnesses and documentary evidence revealed that the series of errors in the debtor's schedules "arise out of the same misunderstanding of the nature of a corporation" and did not demonstrate a pattern of reckless indifference to the truth." 558 B.R. 250, 262 (Bankr. N.D. Ill. 2016).

Thus, based on the court's review of the schedules and Mr. Packer's credible testimony about his intent and knowledge when he prepared them, the court finds that the Bank has not demonstrated the Debtors committed fraud in their submissions in this case.

Nor has the Bank demonstrated that the Debtors otherwise acted fraudulently in this case through their initial request for use of cash collateral. Contrary to the Bank's suggestion otherwise, the cash collateral motion filed by the Debtors early in the case did not state that the Debtors owned any property which in fact they did not. (ECF No. 14.) It stated simply that the "Debtors expect to realize approximately $176,925.75 when the Farm Products are sold and government subsidies regarding the same are received." *Id.* The Bank did not show this statement to be false.  Nor does the August 3, 2017 motion state that the Debtors had a direct right to all the proceeds; on the contrary, the motion indicates that corporate entities are involved in the Debtors' farming operations and the Debtors' ownership interests in these

entities. Additionally, it is undisputed that during the course of the case the Debtors have caused farm proceeds checks to be deposited into the Debtors' cash collateral account at the Bank, with the Bank's agreement, whether required to otherwise or not. Basing its argument upon the Debtors' mere reference to property that may be owned by one or more of their companies, the Bank fails to demonstrate that the Debtors intentionally attempted to defraud through overstating the amount of property they own in the cash collateral motion.

The Bank also takes issue with the use of proceeds from a USDA government subsidy check for $25,552. The testimony showed that Packer Farms received the post-petition remittance in October 2017. The check was later deposited into the Debtors' general debtor-in-possession account. Although the Bank argues that the Debtors improperly paid $9,000 from the proceeds of the check to Mrs. Packer as salary without the Bank's consent or court order, it appears to concede that the proceeds did not constitute cash collateral of the Debtors. Instead, it contends that the check secured certain indebtedness of Packer Farms to the Bank. But here again the Bank does not demonstrate that the Debtors made any fraudulent misrepresentation regarding the subsidy payment, or that court approval of the salary payment was necessary or that the deposit or payment to Mrs. Packer was part of a fraudulent scheme.

Finally, the Bank argues generally that by including claims for which the corporate entities were the primary obligor the Debtors intended to somehow mislead other creditors that the automatic stay applied to their debts. But, neither has the

Bank offered proof that any of these creditors were in fact misled nor that the Debtors'

attempted or actually intended to interrupt collection efforts involving third parties

without reasonable basis. Indeed, the Bank has not identified any attempt by the

Debtors to stay any proceeding or collection effort against the non-debtor entities or

the assets of such entities, or any direct communication by the Debtors to any such

creditor to assert that a stay is in effect. Merely listing claims on which the debtor is

jointly liable as a codebtor or guarantor is hardly sufficient.   Given the broad

statutory definition of "claim," the Debtors are required to list in their schedules

claims on which they were only jointly or secondarily liable as well as their sole or

primary indebtedness. *See* 11 U.S.C. §101(5)(A) (defining "claim" to include

unliquidated, contingent, unmatured and disputed rights to payment). The Bank

failing to show that the Debtors were not at least jointly or secondarily liable on any

of the debts they listed in their schedules, this argument, too, must fail. [16]

## CONCLUSION

Upon weighing the evidence regarding the statements and other actions by the

Debtors contested by the Bank, and viewing the Debtors' errors and mistakes in their

---

[16]The Bank argues that some creditors of the entities may have been confused by the Notice of Chapter 12 Bankruptcy Case sent by the bankruptcy clerk and may have filed improper proofs of claim in the case without presenting evidence of actual creditor confusion. But in any case, the issue is whether the Debtors acted with fraudulent intent, not whether creditors were confused. Moreover, in making this argument Bank fails to address not only the evidence of the lack of actual confusion, but also the numerous safeguards against improper claims found in the record.  For example, the notice clearly names the individuals as the debtors and urges the recipient to consult an attorney (ECF No. 9.) and a party in interest may object to an improper claim. 11 U.S.C. §502(a), (b).  Of course, the potential claimant must become knowledgeable as to the actual basis for its claim before it is filed. Bankruptcy Rule 9011 "imposes a general 'obligation on a claimant to undertake an inquiry reasonable under the circumstances to determine ... that a claim is warranted by existing law and that factual contentions have evidentiary support,' and to certify as much on the proof of claim." *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1415 (2017) (quoting Advisory Committee on Rules of Bankruptcy Procedure, Agenda Book for Meeting 86–87 (Mar. 26–27, 2009)).

totality, the court finds that the movant has not satisfied its burden to prove fraud in connection with the case as required for the conversion of this Chapter 12 case pursuant to 11 U.S.C. §1208(d). Indeed, not only does the record before the court not support conversion, but it also appears that conversion at this time would disregard the concerns and policies reflected in the statutory scheme enacted by Congress for the adjustment of family farmers' debts. Accordingly, the motion of First Trust & Savings Bank of Albany, Illinois to convert this case will be DENIED.

A separate order shall be entered giving effect to the determinations reached herein.


DATE: June 19, 2018

ENTER:    _____
          Thomas M. Lynch
          United States Bankruptcy Judge